1  C. D. Michel – SBN 144258
   Glenn S. McRoberts – SBN 144852
2  Sean A. Brady – SBN 262007
   MICHEL & ASSOCIATES, P.C.
3  180 E. Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Facsimile: (562) 216-4445
5  cmichel@michellawyers.com
   www.michellawyers.com
6  Attorneys for Plaintiffs

7

8              IN THE UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                      SOUTHERN DIVISION

11  DOROTHY McKAY, DIANA          )   CASE NO: SACV 12-1458JVS
    KILGORE, PHILLIP WILLMS,      )   (JPRx)
12  FRED KOGEN, DAVID WEISS, and  )
    THE CRPA FOUNDATION,          )
13                                )   MEMORANDUM OF POINTS AND
                                  )   AUTHORITIES IN SUPPORT OF
14            Plaintiffs,         )   PLAINTIFFS' MOTION FOR
                                  )   PRELIMINARY INJUNCTION
15       v.                       )
                                  )   [Fed. R. Civ. P. 65]
16  SHERIFF SANDRA HUTCHENS,      )
    individually and in her official )
17  capacity as Sheriff of Orange County, )  Date:      October 15, 2012
    California, ORANGE COUNTY     )   Time:      1:30 p.m.
18  SHERIFF-CORONER               )   Location:  Ronald Reagan Federal
    DEPARTMENT, COUNTY OF         )              Building
19  ORANGE, and DOES 1-10,        )              411 West Fourth Street
                                  )              Room 1053
20            Defendants.         )              Santa Ana, CA 92701
    _____)   Courtroom: 10C
21                                    Judge:     James V. Selna
                                      Date Action Filed: September 5, 2012
22

23

24

25

26

27

28

1

<u>**TABLE OF CONTENTS**</u>

2

**PAGE(S)**

3

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

5

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7

8   I.   **PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS
            BECAUSE SHERIFF HUTCHENS' POLICY ABROGATES THEIR
9           FUNDAMENTAL SECOND AND FOURTEENTH AMENDMENT
            RIGHTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10

11          A.   **Carrying Arms for Self-Defense, Whether in Private or Public,
                     Is Core Activity Protected Under the Second Amendment** . . . . . 4

12

13          B.   *Heller* and *McDonald* **Endorse a Scope-Based Analysis
                     for Second Amendment Challenges, Not a Means-Ends
14                   Approach That Necessarily Entails a Balancing of Interests** . . . . 5

15

16          C.   **Sheriff Hutchens' Policy and Application Thereof
                     Cannot Survive a** *Heller* **Scope-Based Analysis** . . . . . . . . . . . . . . 7

17

18               1.   **There Is No Historical Support for Bans on
                           the General Carrying of Firearms in Public
19                         for Self-defense** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20               2.   **Neither** *Heller* **Nor** *McDonald* **Limit Bearing Arms
                           to Inside the Home; Both Assume Public Carry in
21                         Some Manner** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

22

23          D.   **If the Court Employs a Means-Ends Test, Strict Scrutiny
                     Must Apply Because Core Second Amendment Activity Is
24                   Involved** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

25               1.   **Laws Impinging Upon Fundamental Rights
                           Warrant Strict Scrutiny** . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

26

27               2.   *Heller* **Rejects Rational Basis and Interest
                           Balancing Tests** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28

**<u>TABLE OF CONTENTS (CONT.)</u>**

**PAGE(S)**

E.    **Sheriff Hutchens' Policy Cannot Survive Any Heightened Standard of Review Because It Is Not Tailored to Serve, Nor Does It Serve, a Legitimate Government Interest** . . . . . . . . 16

    1.    The Sheriff's Policy Prohibits Almost All Residents from Exercising Their Right to Carry Arms in Public for Self-Defense; It Is Not Tailored to Serve Any Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    **2.**    **Sheriff Hutchens' Policy Does Not Actually Serve Any Legitimate Governmental Interest** . . . . . . . . . . . . . . 18

F.    **Sheriff Hutchens' Policy Violates the Equal Protection Clause Facially and as Applied to Plaintiffs Regardless of Whether It Violates the Second Amendment Per Se** . . . . . . . . . . . . . . . . . . . 20

G.    Alternatively, California's "Good Cause" Provision Itself Facially Violates the Second Amendment and Equal Protection Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.    **PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF PRELIMINARY INJUNCTION IS NOT ISSUED** . . . . . . . . . . . . 22

III.    **THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR AND PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

PAGE(S)

## FEDERAL CASES

*Am. Trucking Ass'ns v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009)........................... 3

Annex Books, Inc. v. City of Indianapolis,
    581 F.3d 460 (7th Cir. 2009)........................... 18

*Associated Gen. Contractors  v. Coal. For Econ. Equity,*
    950 F.2d, 140 (9th Cir. 1991).......................... 23

Bateman v. Perdue,
    No. 10-265, 2012 WL 3068580, at *4 (E.D. N.C. Mar. 29, 2012)............ 13

*Birdt v. Beck,*
    No. 10-08377 (C.D. Cal. Jan. 13, 2011)...................... 11

*Burdick v. Takushi,*
    504 U.S. 428 (1992)............................. 16

*C. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980)............................. 17

City of Cleburne v. Cleburne Living Ctr.,
    473 U.S. 432 (1985)............................ 20

City of Los Angeles v. Alameda Books, Inc.,
    535 U.S. 425 (2002)............................ 18

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)......................... *passim*

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011)....................... 23

Harper v. Va. Bd. of Elections,
    383 U.S. 663 (1966)........................... 20

*Haynes v. Office of the Attorney General Phill Kline,*
    298 F. Supp. 2d 1154 (D. Kan. Oct. 26, 2004)................. 23

Hussey v. City of Portland,
    64 F.3d 1260 (9th Cir. 1995)....................... 20

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2009)...................... 23

Kramer v. Union Free School Dist.,
    395 U.S. 621 (1969)......................... 20, 21

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

### FEDERAL CASES (CONT.)

*Landmark Commc'ns v. Virginia,*
   435 U.S. 829 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*McDonald v. City of Chicago,*
   561 U.S. 3025 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Monterey Mech. Co. v. Wilson,*
   125 F.3d 702 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
   460 U.S. 37 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Peruta v. County of San Diego,*
   758 F. Supp. 2d 1106 (S.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 11

R.A.V. v. City of St. Paul,
   505 U.S. 377 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Reno v. Flores,
   507 U.S. 292 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Richards v. County of Yolo,*
   821 F. Supp. 2d 1169 (E.D. Cal. May 16, 2011). . . . . . . . . . . . . . . . . . 11

S. Cal. Gas Co. v. City of Santa Ana,
   336 F.3d 885 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Staub v. City of Baxley,
   355 U.S. 313 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Stop H-3 Ass'n v. Dole,*
   870 F.2d 1419 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Thomson v. Torrance Police Dept.,*
   7-10, No. 11-06154 (C.D. Cal. July 2, 2012). . . . . . . . . . . . . . . . . . . . . 11

*Thompson v. Western States Medical Center,*
   535 U.S. 357 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Turner Broadcasting Systems, Inc. v. FCC,*
   520 U.S. 180 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

United States v. Chester,
   628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Virginia,*
   518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

### FEDERAL CASES (CONT.)

United States v. Weaver,
     No. 09-00222, 2012 WL 727488, at *4 n.7 (S.D. W. Va. Mar. 6, 2012) . . . . . . . . . . 13

*Ward v. Rock Against Racism,*
     491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Woollard v. Sheridan,
     No. 10-02068, 2012 WL 695674, at *7 (D. Md. Mar. 2, 2012) . . . . . . . . .   13, 19, 20

*Zepeda v. U.S. Immig. & Naturaliz. Serv.,*
     753 F.2d 719 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

### STATE CASES

Andrews v. State,
     50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Judy v. Lashley,*
     50 W.Va. 628 (1902). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Nunn v. State,*
     1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State v. Chandler,*
     5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State v. Huntly,*
     25 N.C. 418 (1843). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

State v. Reid,
     1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

### STATUTES, RULES & OTHER AUTHORITY

California Penal Code § 25400. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 25850. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

California Penal Code § 26150. . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 22

California Penal Code § 26165. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 26185. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 23160. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

**STATUTES, RULES & OTHER AUTHORITY**

California Penal Code § 26350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Federal Practice and Procedure § 2948.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**BOOKS, ARTICLES & EDITORIALS**

*An Act for the Better Ordering and Governing Negroes and Other Slaves
in this Province, and to Prevent the Inveigling or Carrying Away Slaves
from Their Masters or Employers* (Ga. 1765), *in Statutes Enacted by the
Royal Legislature of Georgia* 668 (1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*An Act Forbidding and Punishing Affrays* (Va. 1786), *in A
Collection of All Such Acts of the General Assembly of Virginia,*
    33 (Augustine Davis ed., 1794). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Modeling the Second Amendment Right to Carry Arms (I):
Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense,*
    61 Am. U. L. Rev. 585, 623-32 (2012) Michael P. O'Shea, . . . . . . . . . . . 10

*The American & English Encyclopedia of Law,*
    729 (David S. Garland & Lucius P. McGehee, 2d ed. 1896) . . . . . . . . . . . . 8

The American Students' Blackstone,
    84 n.11 (G. Chase ed. 1884). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*What a Balancing Test Will Show for Right-to-Carry Laws,*
    71 Md. L. Rev. 1205 (2012) John R. Lott, Jr. . . . . . . . . . . . . . . . . . . . . . 19

# INTRODUCTION

Defendants Orange County Sheriff Sandra Hutchens, Orange County Sheriff-Coroner Department, and the County of Orange (hereinafter "Sheriff Hutchens") have adopted and implement an official written policy for issuing licenses to publicly carry a handgun that requires the applicants to prove they have a special need for such a license beyond a general desire for self-defense. This standard disqualifies most Orange County residents, including Plaintiffs, from obtaining such a license.

These licenses are the only lawful means to generally carry a handgun for self-defense in public. As such, Sheriff Hutchens' policy deprives law-abiding adults like Plaintiffs of their right to bear arms under the Second Amendment to the United States Constitution; particularly, their right, as the Supreme Court described it, "to possess and carry firearms in case of confrontation" for self-defense purposes. *District of Columbia v. Heller*, 554 U.S. 570, 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

There is no textual or historical support for Sheriff Hutchens' policy of prohibiting *most* people from exercising in *most* public places their fundamental, constitutional right to armed self-defense. Sheriff Hutchens' policy is thus unconstitutional on its face and as applied to Plaintiffs, and by operation of law causes Plaintiffs irreparable harm. Enjoining implementation of her policy will restore Plaintiffs' constitutional rights and also restore those rights to all Orange County residents, thereby serving the public interest as well as equity.

Injunctive relief preventing Sheriff Hutchens from continuing to implement her current unconstitutional policy pending resolution of this lawsuit is warranted.

## STATEMENT OF FACTS

With few and very limited exceptions, California has banned the unlicensed carrying of handguns in most public places whether loaded (Cal. Penal Code § 25850) or unloaded (Cal. Penal Code § 26350), and whether concealed (Cal. Penal

Code § 25400) or exposed (Cal. Penal Code § 26350).

California law vests in Sheriff Hutchens the authority to issue licenses that allow for carrying loaded handguns about generally in public (a "Carry License") to Orange County residents who submit a written application showing they meet certain statutorily required criteria. Cal. Penal Code § 26150.

A Carry License applicant must successfully complete a handgun training course covering handgun safety and California firearm laws (Cal. Penal Code § 26165), and must pass a criminal background check (Cal. Penal Code § 26185). And, even if an applicant successfully completes the background check and a suitable handgun training course, a Carry License may only be issued if the applicant is additionally proven to be of "good moral character" and to have "good cause" for carrying a loaded handgun in public. Cal. Penal Code § 26150.

Carry License issuing authorities currently exercise discretion in deciding whether an applicant has "good cause" to be issued a license. While most issue such licenses to virtually all law-abiding, competent adult applicants seeking one for self-defense who meet the other criteria, some choose to rarely issue them.

California law requires that each issuing authority publish an official written policy articulating, among other things, what the sheriff has chosen to consider "good cause" for a Carry License. Cal. Penal Code § 23160. Sheriff Hutchens has chosen to adopt an official written policy that rejects as "good cause" applicants' "general concerns about personal safety." (Pls.' Req. Judicial Notice, Ex. OO.) To even *potentially* satisfy Sheriff Hutchens' "good cause" standard, applicants must at minimum prove they are the target of a specific threat or engage in business that subjects them to "far greater risk than the general population." (Pls.' Req. Judicial Notice, Ex. OO.)

Because California law generally prohibits the unlicensed, public carrying of handguns, a Carry License is the only means by which an individual can lawfully go about armed for self-defense in most public places in California. In

1    short, the Sheriff's policy of denying such licenses denies *most* individuals the

2    ability to lawfully carry a firearm for self-defense in *most* public places.

3         Plaintiffs Dorothy McKay, a public school teacher and National Rifle

4    Association-certified Firearms Instructor / Range Safety Officer who often travels

5    to remote areas to provide tutoring and training services (Decl. of Dorothy McKay

6    Supp. Mot. Prelim. Inj. ["McKay Decl."] ¶¶ 4-5); Phillip Willms, a businessman

7    and competitive shooter (Willms Decl. ¶¶ 3-6); Fred Kogen, a medical doctor who

8    travels performing the controversial procedure of infant circumcision (Kogen

9    Decl. ¶ 4-5); and David Weiss, a pastor who travels providing ministry services

10   often to unknown parishioners in unfamiliar areas (Weiss Decl. ¶ 4); each applied

11   to Sheriff Hutchens for a Carry License, asserting a desire for general self-defense

12   as their "good cause."(McKay Decl. ¶¶ 7-8; Willms Decl. ¶¶ 8-9; Kogen Decl. ¶¶

13   7-8; Weiss Decl. ¶¶ 6-7.) Sheriff Hutchens denied each of them for lack of "good

14   cause."(McKay Decl. ¶ 9; Willms Decl. ¶ 10; Kogen Decl. ¶ 9; Weiss Decl. ¶ 8.)[1]

15        Supporters of Plaintiff The CRPA Foundation, such as Plaintiff Diana

16   Kilgore, refrain from applying for a Carry License from Sheriff Hutchens because

17   they do not meet her official heightened "good cause" standard, and it would be

18   futile to do so. (Kilgore Decl. ¶¶ 4-7; Silvio Decl. ¶¶ 7-8.)

19   **ARGUMENT**

20        Plaintiffs seeking a preliminary injunction must establish that: (1) they are

21   likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the

22   absence of preliminary relief; (3) the balance of equities tips in their favor; and (4)

23   an injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*,

24   559 F.3d 1046, 1052 (9th Cir. 2009)). Plaintiffs can satisfy their showing under

25   each prong. A preliminary injunction is thus appropriate here.

26   

27       [1] Plaintiff Willms requested reconsideration of his denial, and on March 21,

28   2012, his denial was confirmed. (Willms Decl. ¶¶ 11-12.)

I.   **PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS BECAUSE SHERIFF HUTCHENS' POLICY ABROGATES THEIR FUNDAMENTAL SECOND AND FOURTEENTH AMENDMENT RIGHTS**

   A.   **Carrying Arms for Self-Defense, Whether in Private or Public, Is Core Activity Protected Under the Second Amendment**

At the end of its detailed parsing of the Second Amendment's operative clause in *Heller*, the Supreme Court concluded that "[p]utting all of these textual elements together, we find that they guarantee the individual right to possess *and carry* weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added). In defining what it means to "bear" or "carry" arms, the Court adopted Justice Ginsburg's definition from an earlier case, finding "the most familiar meaning" is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584 (citation omitted).

As the Court explained in *McDonald v. City of Chicago*, 561 U.S. 3025, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010): "Self-defense is a basic right, . . . and in *Heller*, we held that individual self-defense is 'the central component' of the Second Amendment right." *Id.* at 3036 (citation omitted). The Court thus characterized the right to bear arms for self-defense as part of the holding, not mere dictum. Heller and McDonald repeatedly confirm this. See, e.g., Heller, 554 U.S. at 628 ("the inherent right of self-defense has been central to the Second Amendment right"); *McDonald*, 130 S. Ct. at 3023 ("[*Heller*] concluded that citizens must be permitted 'to use handguns for the core lawful purpose of self-defense' "). Further, the right to armed self-defense exists in both private and public settings. As discussed in detail, *infra*, *Heller* and *McDonald* expressly, implicitly, and repeatedly make this point – even the dissent in *Heller* concedes it.

Here, Sheriff Hutchens' Carry License policy completely deprives Plaintiffs and *most* Orange County residents from carrying arms for self-defense purposes in *almost all* public places. Such a comprehensive prohibition of a fundamental right

1   is necessarily unconstitutional. So, while important, this case is simple.

2          As explained below, the proper test – and the only test approved by the

3   Supreme Court – for analyzing broad-based prohibitions on the exercise of Second

4   Amendment rights is the scope-based test applied in *Heller* and *McDonald*. So this

5   Court need not wade into the standard of review quagmire. In any event, whatever

6   standard ultimately applies here, the burden is on Sheriff Hutchens to prove her

7   policy survives some form of heightened judicial review. And that she cannot do.

8      **B.     *Heller* and *McDonald* Endorse a Scope-Based Analysis for Second
              Amendment Challenges, Not a Means-Ends Approach That
9              Necessarily Entails a Balancing of Interests**

10         The Supreme Court, while not settling on a framework for reviewing all

11  Second Amendment challenges, has left little doubt that courts are to assess gun

12  laws based on "both text and history," *Heller*, 554 U.S. at 595, and not by

13  resorting to interest-balancing tests. The Supreme Court rejects the "tiers-of-

14  scrutiny" framework. *Id.* at 628 n.27, 634-35. *Heller* advances an analytical

15  approach that first focuses on "examination of a variety of legal and other sources

16  to determine *the public understanding* of [the] legal text," *id.* at 605, with

17  particular focus on "the founding period," *id.* at 604, to determine whether the

18  restricted activity falls within the scope of the Second Amendment. If it does, the

19  court again turns to "text and history" to determine whether the particular

20  restriction is nevertheless permissible because it is similar or analogous to

21  restrictions historically understood as  permissible limits on the right to bear arms,

22  i.e., whether there is "historical justification for those regulations." *Id.* at 635.

23         In short, where sufficient historical justifications exist for a restriction on

24  activity falling within the scope of the right, then the restriction is valid; if not, it

25  is invalid. *See id.* at 634-35. The presumption, of course, is that activity falling

26  within the scope of the right to arms "shall not be infringed," with the burden on

27  the government to justify the challenged restriction, *based on text, history, and*

28  *tradition. See id.* at 634-36.

1    The Supreme Court's reliance upon text and history rather than judicial
2  balancing is also reflected in what *Heller* did *not* examine. Notably absent from its
3  analysis is any reference to "compelling interests," "narrowly tailored" laws, or
4  any other means-ends scrutiny jargon. Nor was there talk of "legislative findings"
5  purporting to justify the District's restrictions. Instead, *Heller* focused on whether
6  the challenged laws restricted the right to arms as it was understood by those who
7  drafted and enacted the Second and Fourteenth Amendments. *Id.* at 626-34.

8    The Court gleaned its understanding from an extensive examination of the
9  textual and historical narrative of the right to arms, *id.* at 605-19, emphasizing that
10 "[c]onstitutional rights are enshrined with the scope they were understood to have
11 when the people adopted them, whether or not future legislatures or (yes) even
12 future judges think that scope too broad." *Id.* at 634-35.

13    The *Heller* Court ultimately found that handguns are arms protected by the
14 Second Amendment, *id.* at 629, and held that keeping handguns in one's home for
15 self-defense purposes is core conduct protected by the same, *id.* at 635. Because
16 the District's handgun ban and locked-storage requirement directly conflicted with
17 or precluded protected conduct, and because there was no historical antecedent for
18 such restrictions, the laws were deemed per se unconstitutional. *Id.* at 628-30.

19    The Court's later decision in *McDonald* further underscored the notion that
20 history and tradition, rather than burdens and benefits, should guide analyses of
21 the Second Amendment's scope. Like *Heller*, *McDonald* did not use balancing
22 tests, and it expressly rejected judicial assessment of "the costs and benefits of
23 firearms restrictions," stating that courts should not make "difficult empirical
24 judgments" about the efficacy of particular gun regulations. *McDonald*, 130 S. Ct.
25 at 3050. This language is compelling. Means-ends tests, like strict or intermediate
26 scrutiny, necessarily require assessing the "costs and benefits" of regulations, as
27 well as "difficult empirical judgments" about their effectiveness.

28    As such, those tests are inappropriate here. This court should evaluate

MOTION FOR PRELIMINARY INJUNCTION

1    Sheriff Hutchens' policy using the same scope-based, historical test employed by

2    the Supreme Court in both *Heller* and *McDonald*.

3    **C.    Sheriff Hutchens' Policy and Application Thereof Cannot Survive a *Heller* Scope-Based Analysis**

4          In California, with limited exceptions, the only lawful way one can carry a

5    handgun in public generally for self-defense purposes is with a Carry License.

6    This means Sheriff Hutchens' policy bars those, including Plaintiffs, who do not

7    cite a "good cause" that she finds acceptable from being able to legally go about

8    armed for self-defense outside of their homes. For her policy to be valid, the

9    Sheriff must show that prohibiting law-abiding, competent adults from exercising

10   their right to go about armed for self-defense in public, unless they can prove

11   some special need for doing so that she subjectively agrees with, is commonplace

12   in our history and traditions. Sheriff Hutchens can make no such showing.

13         The text of the Second Amendment does not limit the carry-right to within

14   the home. As *Heller* noted, "the Second Amendment, like the First and Fourth

15   Amendments, codified a *pre-existing* right . . . declar[ing] only that it 'shall not be

16   infringed.' " *Heller*, 554 U.S. at 592. And nothing in the historical record suggests

17   this "['pre-existing'] individual right to possess and carry weapons in case of

18   confrontation," *id.*, has been regarded as limited to the home.

19         Moreover, *Heller* did *not* suggest that carrying firearms could be generally

20   banned in public or that the right to arms was limited to one's home. It did suggest

21   that laws restricting possession in "sensitive places" might be lawful, *id.* at 626,

22   and it cited several cases indicating that regulations on the manner of public carry

23   (open versus concealed) might also pass constitutional muster, *id.* at 629. But, as

24   discussed in detail below, both observations support an historical understanding

25   that public carry may be regulated to some extent but must be permitted, generally.

26         **1.    There Is No Historical Support for Bans on the General Carrying of Firearms in Public for Self-defense**

27         Firearms carried for self-defense have historically been ubiquitous in

28   American public life. *See* Judy v. Lashley, 50 W.Va. 628, 41 S.E. 197, 200 (1902)

1   (citing 5 The American & English Encyclopedia of Law 729 (David S. Garland &

2   Lucius P. McGehee, 2d ed. 1896)) ("So remote from a breach of the peace is the

3   carrying of weapons, that at common law it was not an indictable offense, nor any

4   offense at all.") As the *Heller* Court noted, "the right [to arms] secured in 1689 as

5   a result of the Stuarts' abuses was by the time of the founding understood to be an

6   individual right protecting against both public and private violence." *Heller*, 554

7   U.S. at 594 (emphasis added). Our Founding Fathers certainly seem to have been

8   of this understanding.[2] Many jurisdictions even "required individual arms-bearing

9   for public-safety reasons." *Id.* at 601.[3]

10       Typical regulations of arms-bearing during the founding era were narrowly

11   tailored for specific purposes, such as laws prohibiting slaves from bearing arms[4]

12   or, the most prevalent, laws codifying the common-law offense of carrying

13   unusual arms to the terror of the people.[5] This narrow limit on the right to bear

---

15      [2] Thomas Jefferson wrote a nephew, "Let your gun therefore be the constant
16   companion of your walks." Thomas Jefferson, *Writings* 816-17 (Merrill D.
Peterson ed., 1984). John Adams publicly carried arms Anne H. Burleigh, John
17   Adams 8-9 (1969), as did George Washington Benjamin O. Tayloe, *Our Neighbors*
18   *on LaFayette Square: Anecdotes and Reminiscences* 47 (1872).

19      [3] For example, In 1623, Virginia forbade its colonists to travel unless they
20   were "well armed"; in 1631 it required target practice on Sunday and for people to
"bring their peeces to church." The Right To Keep And Bear Arms: Report of the
21   Subcommittee on the Constitution of the Committee on the Judiciary, U.S. Senate,
97th Cong., 2d Sess. 3 (1982) (footnotes omitted).
22

23      [4] *See, e.g., An Act for the Better Ordering and Governing Negroes and*
*Other Slaves in this Province, and to Prevent the Inveigling or Carrying Away*
24   *Slaves from Their Masters or Employers* (Ga. 1765), *in Statutes Enacted by the*
*Royal Legislature of Georgia* 668 (1910) (making it generally unlawful for "any
25   slave, unless in the presence of some white person, to carry and make use of
26   firearms").

27

28      [5] *See An Act Forbidding and Punishing Affrays* (Va. 1786), *in A Collection*
*of All Such Acts of the General Assembly of Virginia* 33 (Augustine Davis ed.,

arms in the last-mentioned regulation does not apply "unless such [firearm] wearing be accompanied with such circumstances as are apt to terrify the people; consequently the wearing of common weapons, or having the usual number of attendants, merely for ornament or defence, where it is customary to make use of them, will not subject a person to the penalties of this act." William W. Hening, *The New Virginia Justice*, *in The Commonwealth of Virginia* 50 (2d ed. 1810). Thus, although "going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . it should be remembered, that in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner as to terrify the people unnecessarily." Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822).[6]

   While this widely accepted prohibition on bearing arms with the purpose to terrify confirms some limitations on the right were – and still are – tolerated by the Second Amendment, its prevalence militates against the validity of policies like Sheriff Hutchens' that broadly prohibit law-abiding citizens from peaceably carrying operable firearms in non-sensitive public places for their self protection.

   Those who wrote and ratified the Fourteenth Amendment understood the right to bear arms in precisely the same way. In 1866, a Senator remarking on the Freedmen's Bureau Act said "the founding generation 'were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense.' " *Heller*, 554 U.S. at 616 (quoting Cong. Globe, 39th Cong., 1st Sess., 362, 371 (1866)); *see also id.* at 614-15 (citing Stephen P. Halbrook, *Freedmen, the*

---

1794).

   [6] *See also State v. Huntly*, 25 N.C. 418, 422-23 (1843) ("[I]t is to be remembered that the carrying of a gun *per se* constitutes no offence. For any lawful purpose . . . the citizen is at perfect liberty to carry his gun. It is the wicked purpose – and the mischievous result – which essentially constitute the crime.")

1   *Fourteenth Amendment, and the Right to Bear Arms, 1866-1876*, at 19 (1998)).

2       Additionally, an 1866 report to Congress from the Freedmen's Bureau

3   stated: "There must be 'no distinction of color' in the right to carry arms, any more

4   than in any other right." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 297

5   (1866). A Mississippi court recognized this in 1866 when it struck down a state

6   ban on carrying a firearm without a license: "While, therefore, the citizens of the

7   State and other white persons are allowed to carry arms, the freedmen can have no

8   adequate protection against acts of violence unless they are allowed the same

9   privilege." Halbrook, *supra*, at 57-58 (quoting *State v. Wash Lowe*, reprinted in

10  N.Y. Times, Oct. 26, 1866, at 2). Thus, carrying arms for personal defense was

11  widely understood as a right enjoyed by all free people.

12      The *McDonald* Court embraced this view when it cited as an example of

13  laws that would be nullified by the Fourteenth Amendment, a statute providing

14  "no freedman, free negro or mulatto, not in the military service of the United

15  States government, and not licensed so to do by the board of police of his or her

16  county, shall keep *or carry* fire-arms of any kind." 130 S. Ct. at 3038 (internal

17  quotation omitted) (emphasis added). The *McDonald* Court likewise condemned

18  "Regulations for Freedman in Louisiana" which stated no freedman "shall be

19  allowed to carry firearms, or any kind of weapons, within the parish, without the

20  written special permission of his employers, approved and indorsed by the nearest

21  and most convenient chief of patrol." *Id.* (citing 1 Walter L. Fleming,

22  *Documentary of History of Reconstruction* 279-80 (1950)).

23      Further evidence that a right to publicly carry arms for self-defense has been

24  historically recognized is found in the numerous state court cases interpreting

25  constitutional right to arms provisions. "A large body of relevant precedent affirms

26  that the right to bear arms extends outside the home. Thus, courts already have

27  many of the resources they need to resolve the carry rights cases." Michael P.

28  O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial*

1   *Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 Am. U. L. Rev.

2   585, 623-32 (2012) (discussing body of case law from state courts articulating

3   right to carry firearms outside of the home for self-defense purposes).

**2.    Neither *Heller* Nor *McDonald* Limit Bearing Arms to Inside the Home; Both Assume Public Carry in Some Manner**

5   Despite this historical record, some district courts have limited the Second

6   Amendment's protections to the home or, to the extent they recognize a right

7   outside the home (or assume one for purposes of analysis), afford it very little

8   protection. The California district courts to have considered Second Amendment

9   challenges to sheriffs' policies that reject general self-defense as "good cause"

10  have upheld them by either limiting the right to the home, *see, e.g.*, *Richards v.*

11  *County of Yolo*, 821 F. Supp. 2d 1169, 1174-75 (E.D. Cal. May 16, 2011), or by

12  remaining agnostic on whether the right extends beyond the home and upholding

13  such policies because they nevertheless meet "intermediate scrutiny," *see, e.g.*,

14  Civil Minutes - General, *Thomson v. Torrance Police Dept.* 7-10, No. 11-06154

15  (C.D. Cal. July 2, 2012), ECF No. 70; Order Re: Plaintiff's and Defendants'

16  Motions for Summary Judgment 5-7, *Birdt v. Beck*, No. 10-08377 (C.D. Cal. Jan.

17  13, 2011), ECF No. 96; *Peruta v. County of San Diego*, 758 F. Supp. 2d 1106,

18  1116-17 (S.D. Cal. 2010).

19      Those courts confining the Second Amendment, or at least its core, to the

20  home based on *Heller*'s specific facts not only ignore the historical record, but

21  also *Heller*'s detailed analysis and findings on the right's scope. For instance, in

22  noting the right – like all rights – is not unlimited, *Heller* cited two nineteenth

23  century state court cases that upheld concealed carry prohibitions, State v.

24  Chandler, 5 La. Ann. 489, 489-90 (1850) and Nunn v. State, 1 Ga. 243, 251

25  (1846). Heller, 554 U.S. at 626. But both cases involved prohibitions where the

26  right to arms was still readily available by way of *open* carry. Chandler, 5 La.

27  Ann. at 490 (noting the prohibition on carrying concealed weapons "interfered

28  with no man's right to carry arms . . . 'in full view,' which places men upon an

1    equality"); Nunn, 1 Ga. at 251 ("[S]o far as the act . . . seeks to suppress the

2    practice of carrying certain weapons secretly, that it is valid, inasmuch as it does

3    not deprive the citizen of his natural right of self-defence, or of his constitutional

4    right to keep and bear arms. But that so much of it, as contains a prohibition

5    against bearing arms openly, is in conflict with the Constitution, and void; . . .")

6    Thus both cases acknowledge a right to public carry in some manner.

7         This same view of the right to public carry is reflected in Heller's

8    discussion of two other state supreme court opinions holding open carry

9    prohibitions invalid. See Heller, 554 U.S. at 629 (citing Andrews v. State, 50 Tenn.

10    165, 187 (1871); State v. Reid, 1 Ala. 612, 616-17 (1840)).

11         In Andrews v. State, the Tennessee Supreme Court likewise held that a
      statute that forbade openly carrying a pistol "publicly or privately,
12    without regard to time or place, or circumstances," violated the state
      constitutional provision (which the court equated with the Second
13    Amendment). That was so even though the statute did not restrict the
      carrying of long guns. See also State v. Reid, ("A statute which, under
14    the pretence of regulating, amounts to a destruction of the right, or
      which requires arms to be so borne as to render them wholly useless for
15    the purpose of defence, would be clearly unconstitutional").

16    Id. (internal citations omitted).

17         Further support for the right to public carry in some manner, either open or

18    concealed, appears in legal treatises cited by Heller. See, e.g., William Blackstone,

19    The American Students' Blackstone 84 n.11 (G. Chase ed. 1884) ("[I]t is generally

20    held that statutes prohibiting the carrying of concealed weapons are not in conflict

21    with these constitutional provisions, since they merely forbid the carrying of arms

22    in a particular manner . . . ."), cited in Heller, 554 U.S. at 626 (emphasis added).

23         So Heller confirms that this country has historically required government to

24    make available to all law-abiding, competent adults some manner to generally be

25    armed for self-defense in public. And, in noting that "laws forbidding the carrying

26    of firearms in sensitive places such as schools and government buildings" would

27    be "presumptively lawful," Heller reaffirms a right to publicly bear arms exists

28    today. 554 U.S. at 627 n.26. For, it implies that forbidding the carrying of firearms

1    in "non-sensitive" places is not "presumptively lawful" and that even in "sensitive

2    places" the "presumption" may be overcome. If the right were limited to the home,

3    this "sensitive places" qualifier to public carry would be superfluous. Even Justice

4    Stevens concedes the *Heller* majority's view of the Second Amendment includes a

5    right of law-abiding adults to carry arms in public for self-defense purposes and

6    that laws broadly denying that right are likely to fall: "Given the presumption that

7    most citizens are law abiding, and the reality that the need to defend oneself may

8    suddenly arise in a host of locations outside the home, I fear that the District's

9    policy choice may well be just the first of an unknown number of dominoes to be

10    knocked off the table." *Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting).

11      Recognizing *Heller*'s observations correctly, several district courts have

12    definitively confirmed the right of law-abiding adults to publicly bear arms.[7] See

13    e.g., Bateman v. Perdue, No. 10-265, 2012 WL 3068580, at *4 (E.D. N.C. Mar.

14    29, 2012) (the right to bear arms "is not strictly limited to the home environment

15    but extends in some form to wherever [militia] activities or [self-defense or

16    hunting] needs occur") (citations omitted); United States v. Weaver, No. 09-00222,

17    2012 WL 727488, at *4 n.7 (S.D. W. Va. Mar. 6, 2012) ("The fact that courts may

18    be reluctant to recognize the protection of the Second Amendment outside the

19    home says more about the courts than the Second Amendment. Limiting this

20    fundamental right to the home would be akin to limiting the protection of First

21    Amendment freedom of speech to political speech or college campuses");

22    Woollard v. Sheridan, No. 10-02068, 2012 WL 695674, at *7 (D. Md. Mar. 2,

23

24    _____

25      [7] Plaintiffs cite district court cases from other jurisdictions because, due to

26    its nascent state, Second Amendment jurisprudence offers little by way of binding

27    precedent beyond *Heller* and *McDonald*. And, Plaintiffs wish to provide this Court

28    cases showing the California district courts to have ruled on this issue conflict
   with a growing consensus that there is a right to armed self-defense in public.

1   2012) ("the right to bear arms is not limited to the home.").[8]

2         While some courts have gone astray by either limiting the right to the home,

3   accepting the non sequitur that because in-home firearm possession is a "core

4   right" public possession cannot be, and/or wrongly applying means-ends scrutiny

5   (or the wrong version thereof), this Court now has the opportunity to adopt an

6   approach consistent with *Heller* and *McDonald*. In doing so, this Court should

7   find that, while government may regulate carrying arms, the Second Amendment

8   as historically recognized requires allowing law-abiding, competent adults some

9   manner to be publicly "armed and ready" "in case of confrontation." In California,

10  that manner is a Carry License, which Sheriff Hutchens wrongly denies Plaintiffs.

11      **D.    If the Court Employs a Means-Ends Test, Strict Scrutiny Must
             Apply Because Core Second Amendment Activity Is Involved**

12          **1.    Laws Impinging Upon Fundamental Rights Warrant Strict
                 Scrutiny**

13

14        When a law interferes with fundamental constitutional rights, it is subject to

15  "strict judicial scrutiny." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460

16  U.S. 37, 54, 100 S. Ct. 948, 960, 74 L. Ed. 2d 794 (1983) ("strict scrutiny [is]

17  applied when government action impinges upon a fundamental right protected by

18  the Constitution"). *McDonald* laid to rest any doubt about the fundamental nature

19  of the right to bear arms, declaring "the right to bear arms was fundamental to the

20  newly formed system of government." 130 S. Ct. at 3037; *accord id.* at 3042. And

21  the Supreme Court has made clear the Second Amendment does not deserve a

22  lesser status from other rights. See id. at 3043 (plurality op.) ("what [respondents]

23  must mean is that the Second Amendment should be singled out for special–and

24  specially unfavorable–treatment. We reject that suggestion."); see also id. at 3044

25  (rejecting plea to "treat the right recognized in Heller as a second-class right,

26

27         [8] Though these courts mostly interpreted the Second Amendment's scope
28  accurately, they incorrectly applied means-ends scrutiny.

1  subject to an entirely different body of rules than the other Bill of Rights

2  guarantees"). In short, the "default" standard of review for restrictions on

3  fundamental rights must be strict scrutiny. The right to bear arms is no exception.

4        **2.    *Heller* Rejects Rational Basis and Interest Balancing Tests**

5        *Heller* did not explicitly state strict scrutiny is required of laws that restrict

6  rights protected by the Second Amendment because the Court eschewed levels of

7  scrutiny in favor of the scope-based, historical approach outlined above. *Heller*

8  nonetheless points clearly to strict scrutiny as the standard that *would* be required

9  in a levels-of-scrutiny framework, if ever appropriate. *McDonald*'s confirming the

10 fundamental nature of the right to arms eliminated any doubt on that score. So,

11 while *Heller* and *McDonald might* leave open a debate between strict scrutiny and

12 the sui generis historical approach they applied, they foreclose any debate between

13 strict scrutiny and some lesser standard, at least where core conduct is at issue.

14       Even before *McDonald* confirmed the right to arms as fundamental, the

15 inadequacy of intermediate scrutiny was clear from *Heller*, itself. *Heller* explicitly

16 rejected not only rational basis review, but also Justice Breyer's "interest-

17 balancing" approach. 544 U.S. at 628 n.27; *see also McDonald*, 130 S. Ct. at 3050

18 (plurality op.) ("while [Justice Breyer's] opinion in *Heller* recommended an

19 interest-balancing test, the Court specifically rejected that suggestion"). Justice

20 Breyer's approach assumes the government's interest in regulating firearms—

21 some version of protecting public safety—would always be compelling. Thus, in

22 his view, whether the level of scrutiny were strict (requiring a compelling

23 government interest) or intermediate (requiring only an important one), the

24 government interest would always qualify, and the analysis would really turn on a

25 search for the appropriate degree of fit, which Justice Breyer described as interest-

26 balancing. *See Heller*, 554 U.S. at 687-90 (Breyer, J., dissenting).

27       Terminology aside, however, Justice Breyer's approach in substance is

28 simply intermediate scrutiny. Justice Breyer relied on cases such as *Turner*

1 | *Broadcasting Systems, Inc. v. FCC*, 520 U.S. 180, 114 S. Ct. 2445, 129 L. Ed. 2d
2 | 497 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357, 122 S.
3 | Ct. 1497, 152 L. Ed. 2d 563  (2002), which explicitly apply intermediate scrutiny.
4 | *See Heller*, 554 U.S. at 687-90 (Breyer, J., dissenting). Even more revealingly,
5 | Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428, 112 S. Ct. 2059, 119 L.
6 | Ed. 2d 245 (1992), the case on which the United States principally relied in
7 | advocating that the Court adopt intermediate scrutiny. *Heller*, 554 U.S. at 690
8 | (Breyer, J., dissenting); Brief for United States as Amicus Curiae at 8, 24, 28,
9 | *Heller*, 554 U.S. 570 (No. 07-290). Because Justice Breyer's interest-balancing
10 | amounted to intermediate scrutiny and the Court rejected it (and reaffirmed that
11 | rejection in *McDonald*), it would be inappropriate for this Court to adopt
12 | intermediate scrutiny as the standard for judging Sheriff Hutchens' policy.
13 |     In short, because Sheriff Hutchens' policy intentionally and directly denies
14 | most law-abiding, competent adults their right to bear arms for self-defense in
15 | most public places, this Court need not adopt any particular standard of review or
16 | venture beyond the scope-based analysis applied in *Heller* and *McDonald* to
17 | determine Plaintiffs will likely prevail in striking down that policy. But if the
18 | Court finds a means-ends approach is warranted, strict scrutiny must apply.

**E.    Sheriff Hutchens' Policy Cannot Survive Any Heightened
Standard of Review Because It Is Not Tailored to Serve,
Nor Does It Serve, a Legitimate Government Interest**

    1.    The Sheriff's Policy Prohibits Almost All Residents from
Exercising Their Right to Carry Arms in Public for Self-
Defense; It Is Not Tailored to Serve Any Interest

23 |     Under heightened scrutiny, the presumption of validity is reversed, with the
24 | challenged law presumed unconstitutional. See R.A.V. v. City of St. Paul, 505 U.S.
25 | 377, 382,112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) (content-based speech
26 | regulations are presumptively invalid). As the party with the burden of proof,
27 | Sheriff Hutchens must establish "beyond controversy" that her policy satisfies
28 | each element of the applicable heightened scrutiny test to pass constitutional

1   muster. See S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir.

2   2003); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010) ("[U]nless the

3   conduct at issue is not protected by the Second Amendment at all, the Government

4   bears the burden of justifying the constitutional validity of the law.").

5          To prevail under strict scrutiny, Sheriff Hutchens must prove that her policy

6   of denying Carry Licenses to responsible, law-abiding people like Plaintiffs –

7   unless they demonstrate a special need for one – is "narrowly tailored to serve a

8   compelling state interest." Reno v. Flores, 507 U.S. 292, 302, 113 S. Ct. 1439, 123

9   L. Ed. 2d 1 (1993). Under this standard, the Sheriff is not unbound in asserting

10  her compelling interest. Courts do not generally allow legislative fact-finding to

11  undermine a fundamental right. *See Landmark Commc'ns v. Virginia*, 435 U.S.

12  829, 843, 98 S. Ct. 1535, 56 L. Ed. 2d 1 (1978) ("Deference to a legislative

13  finding cannot limit judicial inquiry when First Amendment rights are at stake.").

14         Under intermediate scrutiny, Sheriff Hutchens must prove her policy "is

15  substantially related to achievement of an important governmental purpose." *Stop

16  H-3 Ass'n v. Dole,* 870 F.2d 1419, 1429 n.20 (9th Cir. 1989). Although the means

17  she chooses to advance her goal need not be the *least* restrictive alternative, they

18  must nevertheless be "narrowly tailored" to the state's goal. *Ward v. Rock Against

19  Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2753, 105 L. Ed. 2d 661 (1989). To

20  be valid, a regulation must "directly advance[] the governmental interest asserted,

21  and . . . not [be] more extensive than is necessary to serve that interest." *C. Hudson

22  Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S. Ct.

23  2343, 65 L. Ed. 2d 341 (1980).

24         Even this relatively relaxed standard does not tolerate "categorical

25  exclusion . . . in total disregard of . . . individual merit." *United States v. Virginia*,

26  518 U.S. 515, 546, 116 S. Ct. 2264, 5 L. Ed. 2d 735 (1996). Sheriff Hutchens'

27  policy denies Carry Licenses to most people, even if they (i) are trained, (ii) are

28  law-abiding, (iii) pass a criminal background check, and (iv) are found to be of

1  "good moral character," merely because they have not been targeted for violence

2  recently. That last condition – the only thing standing between Plaintiffs and a

3  Carry License – sweeps far too broadly to be considered "narrowly tailored" – or

4  tailored at all – under intermediate or strict scrutiny.

5      In sum, even if Sheriff Hutchens were able to show her policy furthers some

6  compelling government interest, she would be unable to show that it is tailored to

7  that end. The policy effectively bans public carry for most residents, including

8  Plaintiffs. Additionally, if the goal is to reduce accidental or unlawful shootings,

9  then there are less restrictive means to do so including, e.g., requiring applicants to

10 pass background checks and safety-oriented handgun training courses. Finally, the

11 Sheriff's policy directly conflicts with the right to arms. The constitutional

12 "default position" is that all law-abiding citizens have a right to carry arms for

13 self-defense, subject to some reasonable restrictions tailored to a specific

14 government interest – restrictions that still allow most citizens a manner in which

15 to exercise their right. Sheriff Hutchens' policy gets things backward. It assumes

16 all residents are prohibited from carrying arms and then grants exceptions to

17 certain persons who meet her subjective "good cause" standard. That is the

18 opposite of tailoring, thus rendering the policy invalid regardless of its purpose.

19      **2.    Sheriff Hutchens' Policy Does Not Actually Serve Any
            Legitimate Governmental Interest**

20      The Supreme Court has emphasized that, even under intermediate scrutiny,

21 government cannot "get away with shoddy data or reasoning" and "evidence must

22 fairly support [its] rationale for its ordinance." City of Los Angeles v. Alameda

23 Books, Inc., 535 U.S. 425, 438, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002). Mere

24 "lawyers' talk" unsupported by evidence is insufficient. Annex Books, Inc. v. City

25 of Indianapolis, 581 F.3d 460, 463 (7th Cir. 2009). Even a case cited approvingly

26 by the Heller dissent states government "must demonstrate that the recited harms

27 are real, not merely conjectural, and that the regulation will in fact alleviate these

28 harms in a direct and material way." Turner Broad. Sys., Inc., 512 U.S. at 235.

1    Sheriff Hutchens thus cannot simply assert that the compelling interest of

2   public safety is furthered by her policy. She must prove it. If this Court holds the

3   Sheriff to that burden of proof, she cannot meet it. There simply is no evidence her

4   policy furthers public safety. Concern about license-holders committing crimes or

5   accidents is "mere conjecture" and has been repudiated, repeatedly. Empirical

6   evidence gathered over many years shows such public safety concerns are

7   unfounded. While gun crime is a serious problem, issuing Carry Licenses to law-

8   abiding adults does not exacerbate it and, in fact, may reduce crime.

9    A recently published law review article, examining whether restricting law-

10   abiding individuals' access to Carry Licenses furthers the government's public

11   safety interest, finds overwhelmingly that it does not:

12   There have been a total of 29 peer reviewed studies by economists
     and criminologists, 18 supporting the hypothesis that shall-issue
13   laws reduce crime, 10 not finding any significant effect on crime,
     including the NRC report, and [Aneja, Donohue, and Zhang]'s
14   paper, using a different model and different data, finding that
     right-to-carry laws temporarily increase one type of violent crime,
15   aggravated assaults.

16   John R. Lott, Jr., *What a Balancing Test Will Show for Right-to-Carry*

17   *Laws*, 71 Md. L. Rev. 1205, 1206 (2012**).**

18   Based on its extensive research on the issue, the article concludes that:

19   If right-to-carry laws either reduce crime or leave it unchanged and
     if no one argues that they lead to more accidental gun deaths or
20   suicides, regulations prohibiting people from carrying concealed
     handguns cannot withstand either strict or intermediate scrutiny.
21   *Id.*

22    Likewise, the *Woollard* court, even when applying the incorrect

23   "intermediate scrutiny" standard, held that:

24   A law that burdens the exercise of an enumerated constitutional
     right by simply making that right more difficult to exercise cannot
25   be considered 'reasonably adapted' to a government interest, no
     matter how substantial that interest may be. Maryland's goal of
26   'minimizing the proliferation of handguns among those who do
     not have a demonstrated need for them,' is not a permissible
27   method of preventing crime or ensuring public safety; it burdens
     the right too broadly.

28

MOTION FOR PRELIMINARY INJUNCTION
19

1   Woollard, 2012 WL 695674, at *11.

2        Thus, the Sheriff's policy fails heightened scrutiny on multiple grounds.

3   First, it is not narrowly tailored to serve *any* particular purpose. Rather, it operates

4   as a broad ban on public carry. Second, the public safety rationale (fewer Carry

5   Licenses equals less crime) lacks any evidentiary support; in fact, the evidence

6   cuts the other way. Finally, the Sheriff's policy generally seeks to bar law-abiding

7   citizens from carrying firearms for self-defense unless they show a "special need,"

8   while the Second Amendment seeks to protect the right of all law-abiding citizens

9   "to possess and carry [firearms] in case of confrontation" for self-defense. *Heller*,

10  554 U.S. at  592. The two cannot be reconciled, as explained by the *Woollard*

11  court. Woollard, 2012 WL 695674, at *11-12. One protects a citizen's right to

12  carry arms, the other strips citizens of that right.

13  **F.    Sheriff Hutchens' Policy Violates the Equal Protection Clause**
    **Facially and as Applied to Plaintiffs Regardless of Whether It**
14  **Violates the Second Amendment Per Se**

15        The Equal Protection Clause "is essentially a direction that all persons

16  similarly situated should be treated alike." City of Cleburne v. Cleburne Living

17  Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985) (citation

18  omitted). Strict scrutiny applies to government classifications that "impinge on

19  personal rights protected by the Constitution." Id. at 440 (citations omitted).

20  "Where fundamental rights and liberties are asserted under the Equal Protection

21  Clause, classifications which might invade or restrain them must be closely

22  scrutinized." Hussey v. City of Portland, 64 F.3d 1260, 1265 (9th Cir. 1995)

23  (quoting Harper v. Va. Bd. of Elections, 383 U.S. 663, 670, 86 S. Ct. 1079, 1083,

24  16 L. Ed. 169 (1966), and citing Kramer v. Union Free School Dist., 395 U.S. 621,

25  633, 89 S. Ct. 1886, 1892, 23 L. Ed. 2d 583 (1969)).

26        As these cases make clear, all law-abiding persons are similarly situated in

27  their worthiness to exercise fundamental rights. Since carrying arms is

28  undisputably protected activity under the Second Amendment, *Heller*, 554 U.S. at

1    595, even if assuming *arguendo* that curtailing *all* peoples' ability to generally

2    carry arms in public is a valid government power, by allowing some people to

3    generally carry a handgun in public (i.e., exercise a superior form of the right)

4    while limiting all others to only carrying within their homes or in an emergency,

5    Sheriff Hutchens' policy still violates the Equal Protection Clause unless it meets

6    strict scrutiny; once certain people are granted the right to carry publicly, all

7    qualified persons are entitled to do so. Cf. Kramer, 395 U.S. at 628-29 (holding

8    that even though it need not be granted, once the franchise is granted to the

9    electorate, lines inconsistent with the Equal Protection Clause may not be drawn).

10   The classification created by the Sheriff's policy cannot meet strict scrutiny for the

11   reasons described above. It is exactly the type of ill the authors of the Fourteenth

12   Amendment sought to remedy. The Freedmen's Bureau bill guaranteed "full and

13   equal benefit of all laws and proceedings [for the security of person and estate],

14   including the constitutional right to bear arms." See McDonald, 130 S. Ct. at 3040.

15          Thus, even if this Court finds Plaintiffs unlikely to prevail on their Second

16   Amendment claim, they are still likely to do so on their Equal Protection claim

17   because no legitimate governmental interest is furthered by treating law-abiding,

18   competent persons differently in their access to the fundamental right to armed

19   defense based on their current threat level subjectively determined by the Sheriff.

20          G.     Alternatively, California's "Good Cause" Provision Itself Facially
                   Violates the Second Amendment and Equal Protection Clause
21          While Plaintiffs believe it is Sheriff Hutchens' chosen policy for applying

22   California Penal Code section 26150(a)(2)'s "good cause" provision that causes

23   their injury and not that provision itself, even if the Court finds Sheriff Hutchens'

24   policy blameless, the Court should find section 26150(a)(2) to be a facially

25   unconstitutional precondition on the right to armed self-defense for the same

26   reasons provided against Sheriff Hutchens' policy explained above. For, requiring

27   competent, law-abiding adults like Plaintiffs to prove they have "good cause" to

28   exercise a right beyond self-defense is anathema to the nature of a right; it instead

1    constitutes a privilege granted at the behest of the Sheriff. No textual or historical

2    justification exists for doing so with any fundamental right, let alone the Second

3    Amendment. And, drawing on the First Amendment (as the Supreme Court has

4    done), construing California Penal Code section 26150(a)(2) as conferring

5    discretion on Sheriff Hutchens to determine what constitutes "good cause" to

6    exercise the right to bear arms may create the equivalent of an unlawful prior

7    restraint. A permissible prior restraint must not place "unbridled discretion in the

8    hands of a government official or agency" and must not allow "a permit or license

9    [to] be granted or withheld in the discretion of such official." Staub v. City of

10   Baxley, 355 U.S. 313, 322, 78 S. Ct. 277, 2 L. Ed. 2d 302 (1958).

11          Moreover, the "good cause" provision necessarily creates a classification of

12   Orange County residents, including Plaintiffs, who are deprived of their Second

13   Amendment right to bear arms generally in public because they cannot meet the

14   Sheriff's standard of "good cause" for a Carry License, regardless of whether they

15   are competent and law-abiding, while the rights of other classes of competent,

16   law-abiding Orange County residents are not so infringed. As such, it facially

17   violates the Equal Protection Clause, for the same reasons explained above.

18          In sum, whether the Court finds that it is Plaintiffs' facial or as applied

19   challenge to Sheriff Hutchens' policy on either Second Amendment or Equal

20   Protection Clause grounds, or their facial challenge to California Penal Code

21   section 26150(a)(2)'s "good cause" provision on either Second Amendment or

22   Equal Protection Clause grounds, to be the proper one here, Plaintiffs are likely to

23   succeed on the merits regardless.

24   **II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF A
            PRELIMINARY INJUNCTION IS NOT ISSUED**

25          Generally speaking, once a plaintiff shows a likelihood of success on the

26   merits for a constitutional claim, irreparable harm is presumed. 11A Charles Alan

27   Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ("When an

28   alleged deprivation of a constitutional right is involved, most courts hold that no

1   further showing of irreparable injury is necessary.") Federal courts have routinely

2   imported the First Amendment's "irreparable-if-only-for-a-minute" concept to

3   cases involving other constitutional rights and, in doing so, have held a

4   deprivation of these rights constitutes irreparable harm, per se. *Monterey Mech.*

5   *Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (citing *Associated Gen.*

6   *Contractors  v. Coal. For Econ. Equity*, 950 F.2d, 1401, 1412 (9th Cir. 1991)).

7   Further, the Supreme Court has made clear the Second Amendment should be

8   treated no differently. See McDonald, 130 S. Ct. at 3043, 3044; see also *Ezell v.*

9   *City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (holding deprivations of

10   Second Amendment rights "irreparable and having no adequate remedy at law.")

11       Here, Plaintiffs have established a likelihood of success on the merits of

12   their constitutional claims, and irreparable harm should be presumed.

13   **III.   THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR AND
        PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST**

14       Plaintiffs have suffered and, if this motion is not granted, will continue to

15   suffer the deprivation of their fundamental Second Amendment rights. They are

16   likely to succeed on the merits of their constitutional claims, and the harm invited

17   upon them is irreparable. *See supra* Parts I-II. Yet, not only are Plaintiffs' Second

18   Amendment rights at stake in this action. Any Orange County residents wishing to

19   exercise their Second Amendment right to bear arms who cannot show a "special

20   need" to do so that is acceptable to Sheriff Hutchens can also be unconstitutionally

21   prohibited from exercising that right by the Sheriff's "good cause" policy.

22       The Ninth Circuit has held that when plaintiffs challenge state action that

23   affects the general public seeking to exercise constitutional rights, as Plaintiffs do

24   here for Orange County residents seeking a Carry License, "the balance of equities

25   and the public interest thus tip sharply in favor of enjoining the ordinance." *Klein*

26   *v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). And the Sheriff

27   "cannot reasonably assert that [she] is harmed in any legally cognizable sense by

28   being enjoined from constitutional violations." *Haynes v. Office of the Attorney*

1  *General Phill Kline*, 298 F. Supp. 2d 1154, 1160 (D. Kan. Oct. 26, 2004) (citing

2  *Zepeda v. U.S. Immig. & Naturaliz. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983)).

3         Moreover, as explained above, no valid interest is actually furthered by

4  Sheriff Hutchens' policy because there is no evidence that restricting issuance of

5  Carry Licenses to law-abiding, competent adults actually increases public safety.

6  And little burden is imposed on the Sheriff by the temporary relief Plaintiffs seek.

7  She would merely be precluded from denying self-defense as "good cause" for a

8  Carry License.[9]  Doing so would actually entail *less* work for her department, since

9  investigation and scrutiny concerning applicants' cause for a license would

10  generally be unnecessary.

11        The relief Plaintiffs seek is not extreme. To the contrary, Plaintiffs are

12  merely asking that Sheriff Hutchens join the overwhelming majority of Carry

13  License issuing authorities throughout the nation, in recognizing that law-abiding

14  people are entitled to carry a handgun for self-defense. At least forty states issue

15  Carry Licenses in the manner Plaintiffs assert Sheriff Hutchens must issue them,

16  while four states do not even require licenses to carry handguns at all. (Lott, *supra*,

17  at 1208 n.16; *see also* Pls.' Req. Judicial Notice, Exs. A through PP.) Only Illinois

18  and the District of Columbia do not issue Carry Licenses in any manner. Lott,

19  *supra*, at 1207. In issuing so restrictively, Sheriff Hutchens shares company with

20  only a few states and maybe a dozen or so California counties. She is in a marked

21  minority.

22                              **CONCLUSION**

23        Once it is acknowledged that the Supreme Court has declared armed self-

24  defense as the very core of Second Amendment rights and that the right to be

25  "armed and ready" for a self-defense confrontation extends beyond the home, the

26

27        [9] Plaintiffs are informed and believe and herein allege that the *majority* of

28  California sheriffs already issue Carry Licenses in this manner.

outcome of this case is obvious – at least if the Second Amendment right to arms is afforded the same respect as other fundamental, enumerated rights. For, while it is certainly true that a legislature may impose limited restrictions on the exercise of constitutional rights, e.g., limiting its exercise to virtuous, competent citizens to possess arms in common use and in non-sensitive places, it cannot deny such rights generally. Sheriff Hutchens' "good cause" policy does just that. It bars *all* otherwise qualified, law-abiding applicants from obtaining a Carry License unless they can show an "extraordinary need" to exercise their Second Amendment right to be "armed and ready" for a self-defense confrontation outside the home, a need beyond a general desire for self protection. No other fundamental, enumerated right requires such a showing before one can exercise it.

Consequently, Plaintiffs are likely to prevail on their complaint challenging the constitutionality of Sheriff Hutchens' "good cause" policy for the reasons and on the grounds stated herein. Irreparable harm is presumed because Plaintiffs seek to vindicate their fundamental rights. And, the temporary relief they seek furthers both the public interest, by restoring their fellow Orange County residents' Second Amendment rights, and equity, by treating law-abiding, competent people equally in the enjoyment of their fundamental rights without detriment to the Sheriff.

Plaintiffs respectfully ask the Court to grant this motion and enjoin Sheriff Hutchens' enforcement of her "good cause" policy pending the outcome of this litigation to the extent her policy requires Carry License applicants to show "good cause" for a Carry License beyond a desire for general self-defense.

Date: September 11, 2012

**MICHEL & ASSOCIATES, P.C.**

/ s /C. D. Michel
_____
C.D. Michel
E-mail:cmichel@michellawyers.com
Counsel for Plaintiffs